## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| William Bennis,<br><br>       Plaintiff,<br><br>v.<br><br>Minnesota Hockey Ventures Group, LP,<br><br>       Defendant. | Case No. 12-cv-341 (SRN/JSM)<br><br><br>**MEMORANDUM OPINION<br>AND ORDER** |

Jay A. Tentinger, Tentinger Law Firm, 1380 Corporate Center Curve, #318, Eagan, MN 55121, for Plaintiff.

Thomas J. Conley, Law Office of Thomas J. Conley, 900 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I.      INTRODUCTION

Plantiff William Bennis sued his employer, Defendant Minnesota Hockey Ventures Group ("MHVG"), for age discrimination under the Age Discrimination in Employment Act ("ADEA") and the Minnesota Human Rights Act ("MHRA") (Counts 1 and 3).  (Compl. ¶¶ 25-26, 29-30.)  Mr. Bennis also sued Defendant for a hostile work environment under the ADEA (Count 2).  (Id. ¶¶ 27-28.)  Defendant now moves for summary judgment on all claims.  (Def.'s Mot. for Summ. J. [Doc. No. 20]; Def.'s Mem. in Supp. of Mot. for Summ. J. [Doc. No. 22].)  In addition, Defendant moves for sanctions against Mr. Bennis under Rule 11 of the Federal Rules of Civil Procedure.  (Def.'s Mot. for Rule 11 Sanctions [Doc. No. 25].)

For the reasons that follow, the Court grants Defendant's motion for summary judgment, dismisses the Complaint with prejudice, and denies Defendant's motion for sanctions.

## II.  BACKGROUND

### A. Factual Background

Defendant manages the Xcel Energy Center and related facilities in Saint Paul, Minnesota.  (Def.'s Mem. in Supp. of Mot. for Summ. J. at 2 [Doc. No. 22].)  On May 20, 2004, Mr. Bennis began working with MHVG as a part-time Guest Services Supervisor.  (Compl. ¶ 9 [Doc. No. 1].)  In September 2005, Mr. Bennis was hired full-time as a Guest Services Manager.  (Id.)  On July 1, 2010, Defendant terminated Mr. Bennis.  (Id. ¶ 9.)  Mr. Bennis was 57 years old.  (Id. ¶ 8.)

As a Guest Services Manager, Mr. Bennis's responsibilities included managing Guest Services staff and assisting the Director of Guest Services with duties; interviewing, hiring, and training Guest Service staff; assisting with payroll and scheduling Guest Services staff; assisting with Guest Services estimates for events; liaising with facility personnel; executing emergency training and procedures; ensuring proper facility setup for events; planning and managing event details with Lead Guest Services Supervisors, Guest Services Supervisors, and Guest Services Staff; preparing event information for Guest Services staff; and scheduling, managing, and conducting tour and walking programs.  (Id. ¶ 11.)  The main focus of Mr. Bennis's job was supervising events and working with the other guest services managers. (Stoffel Dep. at

13-16, Ex. 8 to Pl.'s Resp. to Def.'s Mot. for Summ. J. [Doc. No. 34].)  Mr. Bennis had non-event responsibilities as well.  (Id.)

The qualifications for the Guest Services Manager position are experience in guest services and event management; effective communication within the organization (from Guest Services staff to Executive Management) and with outside vendors, clients, contract labor, and agencies; ability to work unusual hours, including evenings, weekends, and holidays; and exhibiting key organization behavior.  (Compl. ¶ 12 [Doc. No. 1].)

During Mr. Bennis's employment with MHVG, the three Guest Services Managers were William Bennis, Rob Armstrong, and Tracy Peters.  (Bennis Dep. at 17, Ex. 1 to Decl. of Thomas J. Conley [Doc. No. 23].)  In the early part of Mr. Bennis's employment, Jason Duffy supervised the three Guest Services Managers.  (Def.'s Mem. in Supp. of Mot. for Summ. J. at 2 [Doc. No. 22].)  After Mr. Duffy left MHVG in 2007, Mark Stoffel briefly supervised the Guest Services Managers.  (Id.)  In 2008, Rachael Johnson was promoted to Director of Guest Services, and she began supervising Mr. Bennis, Mr. Armstrong, and Ms. Peters.  (Johnson Dep. at 44-45, Ex. 3 to Pl.'s Resp. to Def.'s Mot. for Summ. J. [Doc. No. 34]; Bennis Dep. at 17.)  Ms. Johnson also supervised others in the guest services department: Bree Oslin, a scheduling coordinator who worked for Ms. Peters; Keri Johnson, senior manager for suite premium services; and Garon Rowland, assistant manager of premium operations.  (Bennis Dep. at 17-18.)  All of Mr. Bennis's supervisors reported to Jack Larson, the Vice President and General Manager of Xcel Energy Center.  (See Stoffel Dep. at 25.)

Early on in his employment with Defendant, Mr. Bennis's overall performance met job expectations. (Stoffel Dep. at 28, Ex. 2.) Under Mr. Stoffel's supervision, Mr. Bennis contributed to meetings, was engaged, and showed a good work ethic. (Stoffel Dep. at 27-28, 32.) Mr. Bennis was "doing the job that he was hired to do." (Larson Dep. at 15, Ex. 5 to Pl.'s Resp. to Def.'s Mot. for Summ. J. [Doc. No. 34].) In Mr. Bennis's June 2007 performance review, Mr. Stoffel wrote that "Bill [Bennis] and the rest of the Guest Service Managers have done an exceptional job of delivering great customer service to the visitors of Xcel and Rivercentre and continue to be a source of pride for the organization." (Ex. 2 to Stoffel Dep.) Both Mr. Duffy and Mr. Stoffel, however, voiced concerns to Mr. Larson that Mr. Bennis was not always timely or present during his normal work hours.[1] (Larson Dep. at 17-23.) Mr. Stoffel also informed Mr. Larson that Mr. Bennis might not be contributing to non-event work, such as recordkeeping and making reports to improve the department during non-event times. (Id. at 27-28.)

In 2008, when Rachael Johnson became Mr. Bennis's supervisor, Mr. Bennis initially had a "good working relationship" with her. (Bennis Dep. at 15.) After the initial period, however, the relationship "changed for the worse." (Id. at 16.) Mr. Bennis felt that unlike other managers in the department, he "had to go out of my way to develop a relationship with her [Johnson]," and that "there was no trust with our relationship."

---

[1] Throughout the course of his employment, Mr. Bennis received criticism that he took advantage of the flexible nature of the scheduling requirements for Guest Services Managers, and that he did not always arrive or leave on schedule. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 11 [Doc. No. 34].)

(Id.)  Mr. Bennis's relationship with Ms. Johnson was "pretty nonexistent compared to the other managers, especially the female managers."  (Id. at 207.)  Ms. Johnson's management style was hands-on, "micromanaging" to some: Ms. Johnson "wanted to have her fingers on everything and make sure that the decisions were basically hers." (Armstrong Dep. at 18, Ex. 1 to Pl.'s Resp. to Def.'s Mot. for Summ. J. [Doc. No. 34].) Mr. Armstrong felt that Ms. Johnson was stricter with him and Mr. Bennis than she was with their female co-workers.  (Id. at 67-68.)

In November 2008, Tracy Peters accused Mr. Bennis of making racist remarks after President Obama's election.  (Bennis Dep. at 25-26.)  On the day after the election, Mr. Bennis told Ms. Peters, "well, I hope you're happy.  I drove by the welfare office, and the lines were long."  (Id. at 26.)  Offended, Ms. Peters reported the remark to Ms. Johnson.  (Id. at 26-27.)  In response to Ms. Peters's complaint, Ms. Johnson met with Mr. Bennis and gave him the section of the employee handbook that dealt with appropriate workplace conduct.  (Id. at 160.)  Ms. Johnson told Mr. Bennis that "times have changed" and "you have to be careful what you say."  (Id. at 33.)  Mr. Bennis viewed Ms. Johnson's comment as "really age-based."  (Bennis Dep. at 205.)  Mr. Bennis never reported his belief that this comment was ageist to anyone at MHVG.  (Id. at 35.)

On January 30, 2009, Mr. Bennis received his first performance review from Ms. Johnson.  (Decl. of Thomas J. Conley, Ex. 2.)  Mr. Bennis considered it to be a good review, later referring to it as the "most credible and insightful record of my job performance."  (Bennis Dep. at 92, 173-74.)  Mr. Bennis, however, viewed two of Ms. Johnson's comments as age-related.  The first was Ms. Johnson's comment that "it is

very easy to tell the things that are not important to him [Bennis]." (Decl. of Thomas J. Conley, Ex. 2 at 2.) Mr. Bennis thought this comment was age-related:

> Because my personality is pretty laid back . . . I don't get excited about things. I can attend a meeting, and I won't ask a lot of questions. If I have the answer already, I won't ask the question. I felt that that was something that was just age-based on my experience, how I viewed things.

(Bennis Dep. at 94-95.) Mr. Bennis acknowledged that many young people are also laid back. (Id. at 102.) The second comment was Ms. Johnson's observation that Mr. Bennis could improve his "adaptability to new ideas." (Decl. of Thomas J. Conley, Ex. 2 at 3.) Mr. Bennis viewed this comment as age-related because he felt that "where I was, I wasn't willing to change unless there was a good reason. The perception is that older people don't accept new ideas." (Bennis Dep. at 96.)

On August 27, 2009, Mr. Bennis received his second performance review from Ms. Johnson. (Decl. of Thomas J. Conley, Ex. 3.) Mr. Bennis was not happy with this review. (Bennis Dep. at 99.) Ms. Johnson criticized Mr. Bennis's behavior and attitude in small meetings as abrasive, demeaning, and non-participative, and she noted that Mr. Bennis was unable to work with peers on a daily basis. (Decl. of Thomas J. Conley, Ex. 3 at 1-2.) Mr. Bennis viewed Ms. Johnson's criticism as age-related, again attributing his non-participation to his "laid back personality." (Bennis Dep. at 118.) Ms. Johnson also commented that at weekly department meetings, Mr. Bennis would "constantly show up without his glasses unable to read the documents presented[,] therefore creating an environment in which he is unable to participate." (Decl. of Thomas J. Conley, Ex. 3 at 2.) Mr. Bennis felt that this comment related directly to his age. (Bennis Dep. at 108.)

On August 27, 2009, Mr. Bennis and Ms. Johnson discussed the issues raised in the performance review. (Bennis Dep. at 114.) Mr. Bennis did not feel that he had the opportunity to explain his point of view at this meeting, so he requested a second meeting. (Id.) At the second meeting, held on August 28, 2009, Mr. Bennis felt that he was heard. (Id. at 114-15.) Nonetheless, Mr. Bennis left the meeting feeling "frustrated, disappointed and embarrassed," and he understood that "we need to work on strengthening our relationship when it comes to trust and integrity." (Decl. of Thomas J. Conley, Ex. 4 at R26(a)066.)

Mr. Bennis prepared a four-page rebuttal to his August 2009 performance review. (Id. at R26(a)066-070.) This rebuttal contested Ms. Johnson's assessment of Mr. Bennis as abrasive, non-participative, unable to work with peers, disinterested, unapproachable, demeaning, unprepared, and often leaving work early. (Id. at R26(a)070.) Mr. Bennis also stated his belief that his job description was "mostly event driven (90%+)." (Id. at R26(a)066.) Mr. Bennis further contested Ms. Johnson's belief that he was not working the required work hours during the summer. (Id.) However, the rebuttal neither alleged that age was a factor in any of the criticisms nor did it allege that Mr. Bennis was experiencing a hostile work environment. (Bennis Dep. at 120-21.)

On October 13, 2009, Ms. Johnson and Mr. Bennis had their monthly meeting. (Decl. of Thomas J. Conley, Ex. 4 at R26(a)065.) During this meeting, Ms. Johnson acknowledged that she had read his rebuttal, and she reminded Mr. Bennis that his duties were not 90% event-driven. (Id.) To increase office productivity, Ms. Johnson asked

Mr. Bennis to "develop a list of non-event related tasks in the coming week or so," but Mr. Bennis never developed that list. (Id.; Johnson Dep. at 157-58.)

On November 20, 2009, Mr. Bennis prepared and presented an Employee Development Plan ("EDP") to Ms. Johnson for her approval. (Decl. of Thomas J. Conley, Ex. 5.) The EDP is designed to establish goals for each employee to focus on for the coming year. Mr. Bennis based his EDP objectives on his discussions with Ms. Johnson during his performance reviews and monthly one-to-one meetings. (Bennis Dep. at 122.)

Mr. Bennis's first and second EDP objectives involved tracking Wild game hours and payroll to ensure appropriate staffing and to determine any cost reductions, as well as developing a process for doing so. (Decl. of Thomas J. Conley, Ex. 5.) He acknowledged that it was difficult to implement these objectives "because we were going right into our busy season." (Bennis Dep. at 124.) To Mr. Bennis, "it would have to be after our busy time, and that would be in April, May, or June, July, that we could start addressing them." (Id.) By the time of his termination, Mr. Bennis was "in the process of working on" these two objectives. (Id. at 144.) Ms. Johnson did not find Mr. Bennis's efforts satisfactory because others had reduced staff hours, and Mr. Bennis made little effort to reduce staff hours creatively. (Johnson Dep. at 165-67.) Without any specific basis, Mr. Bennis viewed Ms. Johnson's criticism of his lack of effort as age-related. (Bennis Dep. at 141-42.)

Mr. Bennis's third EDP objective involved initiating two new ideas or process changes to improve the guest experience. (Decl. of Thomas J. Conley, Ex. 5.) Mr.

Bennis focused on two existing issues: improving traffic flow at the bottom of an escalator, and eliminating smoke that entered the building. (Bennis Dep. at 125-26.) For the first issue, Mr. Bennis described "put[ting] up tents and barrier for traffic control," and "increas[ing] the number of staff that we had at the bottom of the concourse down there to keep people moving." (Id. at 126.) For the second issue, Mr. Bennis described "chang[ing] the unit out." (Id.) Ms. Johnson, however, concluded that Mr. Bennis had not met this objective because he had not developed any new ideas. (Johnson Dep. at 168.)

Mr. Bennis's fourth EDP objective was to be involved in the selection and placement process for events at the Xcel Energy Center. (Decl. of Thomas J. Conley, Ex. 5.) Mr. Bennis did not complete this objective because he claimed that he did not have access to the scheduling website. (Bennis Dep. at 127-28.) But Ms. Johnson explained that she was not looking for him to replicate what was already on the scheduling website. (Johnson Dep. at 174.) Rather, Ms. Johnson wanted him to develop a new process for determining the correct number of part-time event staff, which Mr. Bennis never did. (Id.)

On several occasions in 2010, Ms. Johnson discussed Mr. Bennis's performance issues with Delores Murphy, Director of Human Resources. (Murphy Dep. at 99-100, Ex. 6 to Pl.'s Resp. to Def.'s Mot. for Summ. J. [Doc. No. 34]; Johnson Dep. at 81-82.) These issues included Mr. Bennis's lack of initiative and lack of accountability to office, or non-event, duties. (Johnson Dep. at 81.) Ms. Johnson and Ms. Murphy reviewed Mr. Bennis's performance reviews, job description, EDP, and Ms. Johnson's notes. (Id. at

79.)  Eventually, the discussion included Steve Weinreich, MHVG's General Counsel, and Jack Larson.  (Id. at 77-78.)

On June 30, 2010, Mr. Bennis reported for work at approximately 3:30 p.m.  Ms. Johnson confronted him because Mr. Bennis was expected to report on a concert day at 2:00 p.m.  (Bennis Dep. at 166.)  Mr. Bennis acknowledges that he did not advise Ms. Johnson that he had changed his schedule for that evening.  (Id. at 183.)  During this conversation, Mr. Bennis expressed his belief that it was unfair to be reprimanded for tardiness when Rob Armstrong had reported late the previous week.  (Id. at 168.)  Mr. Bennis also addressed perceived inequities with the allotted PTO time and availability of summer hours and comp time.  (Id. at 169-70.)  During this conversation with Ms. Johnson, Mr. Bennis asked her whether she was treating him differently because of "where he [Bennis] was in life," without referring to age specifically.  (Id. at 187.)  Mr. Bennis felt that she knew what he meant, because she did not question him in return. (Id.)

On July 1, 2010, Ms. Johnson, Ms. Murphy, Mr. Larson, and Mr. Weinrich decided to terminate Mr. Bennis's employment due to his lack of improvement since the August 2009 performance review and his failure to accomplish the objectives in his November 2009 EDP.  (Johnson Dep. at 79-81, 93-94.)  They also took Mr. Bennis's hours in the office into consideration.  (Id. at 93-94.)  That same day, Ms. Johnson, Mr. Larson, and Ms. Murphy met with Mr. Bennis and terminated him for lack of performance.  (Bennis Dep. at 154-55.)  During the meeting, Mr. Bennis did not claim that his termination related to age or that he had been subjected to a hostile work

environment; instead, he claimed that the termination was "personal" on the part of Ms. Johnson and Ms. Peters.  (Id. at 156.)

Ms. Johnson had been preparing a 2009-2010 performance review for Mr. Bennis just before his termination, but she never delivered it because of the termination. (Johnson Dep. at 189; Murphy Dep., Ex. 3.)  Tracking the four objectives in Mr. Bennis's EDP, Ms. Johnson's review rated Mr. Bennis as needing improvement in one category and failing to meet the other three.  (Murphy Dep., Ex. 3.)  Ms. Johnson's overall comments were:

> Although, Bill [sic] manages the Guest Service Staff at many of the events at the Xcel Energy Center, his commitment to the administrative duties, initiating new ideas and investment in MSE's core values is where he falls short.  Examples include lack of follow-th[r]ough of information that impacts building, not responding to emails, not engaging with staff on a personal level, avoids addressing issues with staff, over delegates his responsibilities and works as little as possible in the office on nonevent days.

(Id. at 2.)

After Mr. Bennis's termination on July 1, 2010, Rob Armstrong—whose job was "very similar" to Mr. Bennis's—absorbed the majority of Mr. Bennis's event duties. (Bennis Dep. at 47; Armstrong Dep. at 56.)  At the time, Mr. Armstrong was thirty-five years old.  (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 8 [Doc. No. 34].)  Tracy Peters, then forty-four years old, did not assume any event duties at the Xcel Center.  (Armstrong Dep. at 57.)  Keri Johnson, then thirty-nine years old, shadowed events on the guest services side but did not play a primary role.  (Id.)  In November 2010, Rachael Johnson hired Diane Bennis as assistant manager for guest services to replace Bree Oslin, who

had moved from the guest services department to the suite department. (Johnson Dep. at 30.) Diane Bennis—approximately one month younger than her husband, the Plaintiff—reported to Tracy Peters and Keri Johnson. (Armstrong Dep. at 58.) Ms. Johnson did not hire anyone to replace Mr. Bennis. (Johnson Dep. at 30.)

**B. Additional Evidence Allegedly Related to Age**

Mr. Bennis bases his age discrimination claims on the following additional grounds.

First, Mr. Bennis alleges that from 2008-2010, he was "held to a higher standard of employment hours than his younger co-workers." (Compl. ¶ 15 [Doc. No. 1].) Mr. Bennis bases his allegation on the Guest Services Managers' monthly schedules. (Bennis Dep. at 40.) The schedules show that Mr. Bennis averaged forty-seven and a half hours per week, and Tracy Peters averaged forty-two hours per week. (Id. at 41-42.) Rob Armstrong averaged more than forty-seven and a half hours per week; his hours were "excessively high." (Id. at 42.) Mr. Bennis did not believe Mr. Armstrong's reported hours were accurate because the calendar allegedly did not reflect when Mr. Armstrong arrived late or left early. (Id. at 44.) Mr. Bennis acknowledged that Ms. Peters had more office responsibilities and fewer events than Mr. Bennis; and with events often lasting into the evening, one would expect Mr. Bennis's job to require more hours. (Id. at 46-47.) Mr. Bennis also stated that he was happy to work the extra hours. (Id. at 45.)

Second, Mr. Bennis alleges that he was required to dress professionally for events while Ms. Peters and Mr. Armstrong were not. Mr. Bennis bases his allegation on the fact that Mr. Armstrong never wore a tie. (Bennis Dep. at 49-50.) When asked why Mr.

Bennis believed that being held to a different dress code standard related to his age, Mr.

Bennis answered:

> A:  Because when I was brought up, people did wear ties to church. People wore ties to—when they flew on an airplane.  And I always felt that's the perception that they had for me.
>
> Q:  Do you have any facts that support that perception?
>
> A:  No.
>
> Q:  Did Rachael Johnson ever say to you, you have to wear a tie because you're old?
>
> A:  No.
>
> Q:  Is there anything else that you have that suggests that you were required to wear a tie because of your age?
>
> A:  No.

(Id. at 53-54.)  Mr. Bennis acknowledges that any difference in dress code did not affect his compensation, vacation, or paid-time off ("PTO").  (Id. at 52.)  Ms. Johnson testified that she asked Mr. Bennis to wear a tie for most events, but she did not request the same of Mr. Armstrong because his events were not as high-profile as Mr. Bennis's.  (Johnson Dep. at 197-98.)

Third, Mr. Bennis alleges that in 2009-2010, Ms. Peters was granted ten more days of PTO than Mr. Bennis.  (See Compl. ¶ 17 [Doc. No. 1]; Bennis Dep. at 55.)  He does not, however, know why Ms. Peters may have had additional time off.  (Bennis Dep. at 55.)  MHVG's records indicate, to the contrary, that in 2009-2010, Mr. Bennis took twenty-eight PTO days, and Ms. Peters took twenty-five days.  (Decl. of Christie Schulte

¶ 3.)  Ms. Peters also had several days off for a medical leave in 2009, and an approved

medical leave did not count against PTO time.  (Id.)

Fourth, Mr. Bennis believes that in 2008 and 2009, his younger co-workers should

not have received as much compensatory time as they did because Mr. Bennis was

working longer hours.  (Bennis Dep. at 58-59.)  Mr. Bennis thought there was a different

comp time policy for Tracy Peters, because Ms. Peters allegedly told Mr. Bennis that she

received comp time from Ms. Johnson when she asked for it.  (Id. at 61.)  Mr. Bennis also

believes that in 2010, Mr. Armstrong and Ms. Peters were allowed shorter work hours in

the summer after Mr. Bennis's termination.  (Id.)  Mr. Bennis based this belief on Mr.

Armstrong's comment ("they're going to start their summer hours as of July"), allegedly

stated after Mr. Bennis's termination. (Id. at 61-62.)

Fifth, Mr. Bennis contends that Ms. Johnson, Mr. Armstrong, and Ms. Peters made

age-discriminatory remarks toward him during his employment with MHVG.  These

remarks include:

- In the summer of 2009, on a work outing to an ice cream shop, Ms. Peters told Mr. Bennis that he was "old-fashioned" for ordering vanilla ice cream. (Bennis Dep. at 79-80.)

- In August 2009, in response to Mr. Bennis's statement that he did not need his reading glasses, Ms. Johnson told Mr. Bennis that "your eyes get worse as you get older."  (Id. at 72-73.)

- In April 2010, Ms. Peters commented that Mr. Bennis did not need his job like Ms. Peters did because Mr. Bennis was retired.  (Id. at 71.)

- Mr. Armstrong commented that Mr. Bennis had no social life because "your kids are all grownup."  (Id. at 75.)

14

- Ms. Peters commented that Mr. Bennis likes Classic Rock because it is "from your era." (Id. at 77.)

**C.  Mr. Bennis's Rebuttal of Termination Evidence**

Mr. Bennis submits the following to rebut Defendant's proffered reasons for his termination.  First, he alleges that Ms. Johnson's words and actions toward him throughout his employment with MHVG show discriminatory intent.  (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 10 [Doc. No. 34].)  Second, he argues that Ms. Johnson terminated him the day after he allegedly accused her of age discrimination.  (Id.)  Third, Ms. Johnson's notes on Mr. Bennis, which were produced in this litigation, were not in the personnel file that Mr. Bennis requested in July 2010.  (Id.)  Fourth, he alleges that Defendant failed to address any alleged performance issues with lesser disciplinary consequences.  (Id.)  Fifth, he claims that after his termination, Defendant enlarged its list of reasons for his termination each time there was an inquiry about the basis for the termination.  (Id. at 15.)  Specifically, on July 27, 2010, Mr. Bennis requested that Defendant provide him with a letter stating the basis for his termination.  Defendant responded that Mr. Bennis was terminated for "[l]ack of performing core tasks of the position in a consistent and effective manner, insubordinate behavior toward management and attendance." (Murphy Depo., Ex. 11 at R26(a)058.)  On May 2, 2011, in response to the EEOC charge filed by Mr. Bennis, he alleges that Defendant provided a more detailed explanation for his termination.  (Aff. of Jay A. Tentinger, Ex. A at R26(a)036-038.)

**D. Evidence of a Hostile Work Environment**

Mr. Bennis alleges that MHVG created a "harassing and hostile work environment based on discrimination against him because of his age." (Compl. ¶ 27 [Doc. No. 1].) He cites the previously described alleged evidence of age discrimination in support of his claim of a hostile working environment. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 21 [Doc. No. 34].) In addition, Mr. Bennis testified at his deposition:

> Q:      [I]n your own words, what constituted the hostile work environment that you experienced at MSE?
>
> A:      It was the difference in treatment that I was receiving while working with MSE, as far as being treated differently than the other employees, managers that I was working with in the guest services department.
>
>         But also the relationship that I had with Rachael Johnson, the type of environment that she fostered as far as having managers work against each other. It was a real difficult position to be in when I was there.
>
> Q:      All right. Is there anything else that you believe constituted—or constitutes a hostile work environment that you experienced at MSE?
>
> A:      . . . I just felt I was being treated different, and the standards were different for me than the rest of the employees.

(Bennis Dep. at 14.) Mr. Bennis further testified that Ms. Johnson "took him out of the picture"—she did not continue to invite him to weekly meetings with higher management. (Id. at 205.) Mr. Bennis never felt physically threatened by Ms. Johnson. (Id. at 21.)

## III.  DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  (Id.)  In considering a motion for summary judgment, the court views the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  Enter. Bank v. Magna Bank of Missouri, 92 F.3d 743, 747 (8th Cir. 1996).  The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Id.  The party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial.  Anderson, 477 U.S. at 256.

### B.  Age Discrimination

Defendant argues that there are no disputed issues of fact regarding Mr. Bennis's age discrimination claims under the ADEA and MHRA, and that they fail as a matter of law.  Specifically, Defendant argues that Mr. Bennis has no direct evidence of age discrimination.  (Def.'s Reply Mem. in Supp. of Mot. for Summ. J. at 2 [Doc. No. 38].)

Defendant also argues that Mr. Bennis has not established a prima facie claim of age discrimination based on indirect evidence. (Def.'s Mem. in Supp. of Mot. for Summ. J. at 15-16 [Doc. No. 22].) Further, even if Mr. Bennis has established a prima facie claim, Defendant argues that Mr. Bennis cannot establish that Defendant's justification for Mr. Bennis's termination was pretext for discrimination. (Id. at 16-17.)

In opposition to Defendant's motion, Mr. Bennis argues that the record raises genuine issues of material fact regarding his claims, making summary judgment inappropriate. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 1-2 [Doc. No. 34].) Mr. Bennis contends that he has direct evidence of age discrimination; that he has established a prima facie case of age discrimination based on indirect evidence; and that questions of fact remain as to whether Defendant terminated Mr. Bennis for its stated reasons, because Rachael Johnson did not like him, or because of age-discriminatory grounds. (Id. at 20.)

The Age Discrimination in Employment Act ("ADEA") and the Minnesota Human Rights Act ("MHRA") prohibit discrimination against employees because of their age.[2] 29 U.S.C. §§ 623(a)(1), 631(a); MINN. STAT. § 363A.08, subd. 2. In ADEA cases, as in other employment discrimination cases, the plaintiff may establish discrimination by two methods of proof: the direct method and the indirect method. Ramlet v. E.F. Johnson Co., 507 F.3d 1149, 1152 (8th Cir. 2007). Where the plaintiff has direct evidence of discrimination—e.g., an admission by a decision maker that he acted on a forbidden basis—the plaintiff simply submits her evidence to the fact finder. Darke v. Lurie

_____

[2] The Court analyzes Mr. Bennis's MHRA claim under the same analysis as the ADEA claim. See Rahlf v. Mo-Tech Corp., Inc., 642 F.3d 633, 637 n.2 (8th Cir. 2011).

Besikof Lapidus & Co., LLP, 550 F. Supp. 2d 1032, 1040-41 (D. Minn. 2008).  When a plaintiff instead has indirect evidence of intentional discrimination, then the plaintiff may rely on the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to avoid summary judgment.  See Tusing v. Des Moines Indep. Cmty. Sch. Dist., 639 F.3d 507, 515 (8th Cir. 2011) (upholding the continued applicability of McDonnell Douglas after Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009)); Haigh v. Gelita USA, Inc., 632 F.3d 464, 468 (8th Cir. 2011) (applying McDonnell Douglas, after Gross, in ADEA claim based on circumstantial evidence).

Under the McDonnell Douglas framework, Mr. Bennis must first present a prima facie case of discrimination.  If he succeeds, he establishes a rebuttable presumption of discrimination, and the burden shifts to Defendant to produce a legitimate, nondiscriminatory explanation for the challenged employment action.  See Twymon v. Wells Fargo & Co., 462 F.3d 925, 934-35 (8th Cir. 2006).  If Defendant does so, Mr. Bennis must then point to admissible evidence sufficient to permit a reasonable jury to find that Defendant's explanation is pretextual.  (See id. at 935.)  Although the burden of production may shift, at all times Mr. Bennis retains the burden of persuasion to prove that age was the "but-for" cause of the termination.  See Rahlf, 642 F.3d at 637.

### 1.  Direct Evidence

Direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action.  Torgerson v. City of Rochester, 643 F.3d 1031, 1044 (8th Cir.

2011). "Direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. (Id.) Direct evidence may include evidence of actions or remarks of the employer that reflect a discriminatory attitude, comments that demonstrate a discriminatory animus in the decisional process, or comments uttered by individuals closely involved in employment decisions. Beshears v. Asbill, 930 F.2d 1348, 1354 (8th Cir. 1991). In contrast, "stray remarks in the workplace," "statements by nondecisionmakers," and "statements by decisionmakers unrelated to the decisionmaking process" do not constitute direct evidence. Radabaugh v. Zip Feed Mills, 997 F.2d 444, 449 (8th Cir. 1993).

Mr. Bennis argues that the direct evidence of age discrimination is his question to Rachael Johnson on June 30, 2010—whether she was treating him badly because of "where he [Bennis] was in life"—and his termination on the next day. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 5 [Doc. No. 34].)

The Court disagrees that Mr. Bennis's reference to "where he was in life," as posed to Ms. Johnson, and his termination on the next day is direct evidence of age discrimination. Mr. Bennis acknowledged at his deposition:

> . . . the way I phrased it is I said, where I'm at in my life. I didn't use the term "age," it's because I'm old, or because I'm, at the time, 58 years old or anything. I just said it's because of where I'm at in my life. I know she knew what that meant, because I didn't get questioned back.

(Bennis Dep. at 187.) The vague phrase—"where I'm at in my life"—and Ms. Johnson's decision not to respond are not direct evidence of age discrimination. Moreover, a non-decision maker—Mr. Bennis, not Ms. Johnson—uttered the statement at issue. See

Radabaugh, 997 F.2d at 449.  Mr. Bennis cannot assume that Ms. Johnson understood what he meant merely based on Ms. Johnson's lack of questioning in response.  Because Mr. Bennis does not present direct evidence of Ms. Johnson's discrimination on the basis of age, the Court analyzes his ADEA and MHRA claims under McDonnell Douglas.

### 2.  Indirect Evidence

#### a.  Prima Facie Case

To establish a prima facie case of age discrimination, Mr. Bennis must show that he: (1) belonged to the protected class, i.e., was at least forty years old; (2) was qualified to perform his job; (3) was terminated; and (4) was replaced by another person sufficiently younger to permit the inference of age discrimination.[3]  McGinnis v. Union Pac. R.R., 496 F.3d 868, 875 (8th Cir. 2007).

Defendant and Mr. Bennis do not contest whether the first, second, and third elements are met: Mr. Bennis was fifty-seven years old at the time of termination; he was qualified to perform his job; and Defendant terminated him on July 1, 2010.  (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 7 [Doc. No. 34]; Def.'s Mem. in Supp. of Mot. for Summ. J. at 15-16 [Doc. No. 22].)

As to the fourth element, Defendant argues that Mr. Bennis does not satisfy the "substantially younger, similarly-situated employees were treated more favorably" standard because although Tracy Peters and Rob Armstrong are younger than Mr. Bennis

---

[3] Mr. Bennis correctly notes that not all courts analyze the fourth element of the prima facie case in precisely the same way.  (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 6 [Doc. No. 34].)  For example, the Eighth Circuit in Onyiah v. St. Cloud State Univ., 684 F.3d 711, 719 (8th Cir. 2012), considered whether "substantially younger, similarly-situated employees were treated more favorably."

and held the same Guest Services Manager position, Defendant did not treat Ms. Peters or Mr. Armstrong more favorably than Mr. Bennis. (Def.'s Mem. in Supp. of Mot. for Summ. J. at 15-16.) In opposition, Mr. Bennis argues that Ms. Johnson held Mr. Armstrong to a lower dress standard than Mr. Bennis, allowed other guest services managers more comp time, and disciplined younger employees less stringently than Mr. Bennis. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 7-8 [Doc. No. 34].) Mr. Bennis also argues that under the "replaced by another person sufficiently younger" standard, his replacements were sufficiently younger. (Id. at 8.)

The Court considers the fourth element under both the "replaced by another person sufficiently younger" standard of McGinnis and the "substantially younger, similarly-situated employees were treated more favorably" standard of Onyiah. Under the McGinnis standard, Mr. Bennis has not shown that he was "replaced by another person sufficiently younger to permit the inference of age discrimination." See 496 F.3d at 875. After Mr. Bennis's termination on July 1, 2010, Ms. Johnson did not designate or hire anyone as Mr. Bennis's permanent replacement. See Lewis v. St. Cloud State Univ., 467 F.3d 1133, 1136 ("We think that the important datum here is the age of the person whom [the defendant] chose as [the plaintiff's] permanent replacement."). Rob Armstrong, then thirty-five years old, absorbed most of Mr. Bennis's immediate event duties but did not replace Mr. Bennis permanently. (See Armstrong Dep. at 56.) Tracy Peters, then forty-four years old, neither assumed any event duties at the Xcel Center nor replaced Mr. Bennis permanently. (Id. at 56-57.) Keri Johnson, then thirty-nine years old, shadowed some events on the guest services side but did not play a primary role. (Id. at 57.) In

November 2010, Rachael Johnson hired Diane Bennis—who is approximately one month younger than Mr. Bennis—as assistant manager for guest services. (Id. at 57-58; Johnson Dep. at 30.) Reporting to Ms. Peters and Keri Johnson, Diane Bennis replaced Bree Oslin, who had moved from the guest services department to the suite department. (Johnson Dep. at 30.) Because no one permanently replaced Mr. Bennis, Mr. Bennis does not satisfy the fourth element of a prima facie case under the McGinnis standard.

Likewise, Mr. Bennis does not satisfy the fourth element under the Onyiah standard. The evidence does not support Mr. Bennis's assertion that Ms. Johnson treated substantially younger, similarly-situated employees more favorably than Mr. Bennis. The Court considers Mr. Armstrong and Ms. Peters—the other guest services managers—to be similarly-situated as Mr. Bennis, while noting that Mr. Armstrong's position was most similar to Mr. Bennis's.[4] (See Bennis Dep. at 45-47.)

First, Mr. Bennis could not support his perception that Ms. Johnson held him to a higher dress standard than Mr. Armstrong:

> Q:    So let's assume that you were held to a different standard when it comes to dress. Why is it that you think that's because of your age, as opposed to any other factors?
>
> A:    . . . well, I always felt that the expectations were higher for me because of my age.
>
> Q:    Why did you feel that way?

---

[4] Mr. Armstrong's job was "[v]ery similar" to Mr. Bennis's. (Bennis Dep. at 47.) In comparison, Ms. Peters's job was different from Mr. Armstrong's and Mr. Bennis's because her job was more office-based than event-based. (Id. at 46-47.)

A:     Because when I was brought up, people did wear ties to church. People wore ties to—when they flew on an airplane. I always felt that's the perception that they had for me.

Q:     Do you have any facts that support that perception?

A:     No.

Q:     Did Rachael Johnson ever say to you, you have to wear a tie because you're old?

A:     No.

Q:     Is there anything else that you have that suggests that you were required to wear a tie because of your age?

A:     No.

(Bennis Dep. at 53-54.) Rather, the evidence suggests that Ms. Johnson asked Mr. Bennis to wear a tie because Mr. Bennis worked higher-profile events than Mr. Armstrong, for which dress mattered more. (See Johnson Dep. at 197.) Mr. Bennis acknowledges that any difference in dress code did not affect his compensation, vacation, or PTO time. (Bennis Dep. at 52.)

Second, the record does not show that Ms. Johnson granted other guest services managers more paid-time off on the basis of age. Mr. Bennis could not provide any evidence that Mr. Armstrong or Ms. Peters received more paid-time off than Mr. Bennis. (Bennis Dep. at 56-57.) If anything, the allegation is that Ms. Johnson drew distinctions along gender lines for approving paid-time off:

Q:     . . . And if I remember your testimony, you felt like Rachael Johnson was more strict with you [Armstrong] and Bill [Bennis] in getting time off than she was with Tracy [Peters].

A:     Yeah. Tracy or Bree or Keri.

> Q:   Okay. And I—when we had talked earlier, you had told me you thought it was more, if anything, a male/female split than an age split; right?
>
> A:   I would agree that it was definitely—the guys were treated differently than the girls.

(Armstrong Dep. at 67-68.)  Moreover, MHVG's records indicate that in 2009-2010, Mr. Bennis took twenty-eight PTO days, and Ms. Peters took twenty-five days.  (Decl. of Christie Schulte ¶ 3.)  Ms. Peters also had several days off for a medical leave in 2009, and an approved medical leave did not count against PTO time.  (Id.)

Third, the record does not show that Ms. Johnson allowed Mr. Armstrong and Ms. Peters to work shorter summer hours during Mr. Bennis's employment in 2010.  Mr. Bennis alleges that after his termination, Mr. Armstrong and Ms. Peters could work shorter hours in the summer.  (Bennis Dep. at 61-62.)  But Mr. Bennis bases his belief solely on a comment made by Mr. Armstrong in July 2010, and he has presented no evidence that Ms. Johnson favored Mr. Armstrong and Ms. Peters with respect to summer hours while Mr. Bennis was employed with MHVG—the relevant time period for comparison purposes.  (Id. at 61-62.)

Fourth, the record does not show that Ms. Johnson disciplined younger employees less stringently than Mr. Bennis.  When comparing his late arrivals with Mr. Armstrong's, Mr. Bennis could not confirm that Mr. Armstrong was actually disciplined:

> Q:   Did you ever complain to a Rachael Johnson about Rob Armstrong's late arrivals?
>
> A:   Yes.

Q:      What did she say?

A:      She said, you should thank—he should be thanking you.  That was her comment to me.

Q:      How do you know he wasn't disciplined for those late arrivals?

A:      I don't think he was.  I don't know.

Q:      You don't know?

A:      I was never told.  Rob never said it.

Q:      Okay.

A:      But if he was disciplined like I was disciplined, he wouldn't have been working there.

(Bennis Dep. at 82-83.)  Mere speculation about Mr. Armstrong's lack of discipline does not show that Ms. Johnson disciplined Mr. Bennis's younger co-workers less stringently. Thus, Mr. Bennis has not shown that she treated younger, similarly-situated employees more favorably than Mr. Bennis.

Because Mr. Bennis fails to meet the fourth element under both the <u>McGinnis</u> and <u>Onyiah</u> standards, he has not presented a prima facie case of age-based discrimination.

### b.  Legitimate, Nondiscriminatory Reason for Termination

Even if the Court found that Mr. Bennis established a prima facie case, Defendant can rebut the inference of unlawful discrimination by offering a legitimate, nondiscriminatory explanation for its decision to terminate Mr. Bennis.  "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'"  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142 (2000).  A proffered legitimate, nondiscriminatory reason need not be correct if the employer honestly believed the

asserted grounds at the time of the adverse employment action. Twymon, 462 F.3d at 935.

Defendant contends that it terminated Mr. Bennis because of his lack of improvement since the August 2009 performance review and his failure to accomplish the objectives in his November 2009 Employee Development Plan. (Johnson Dep. at 79-81, 93-94.) Defendant also considered Mr. Bennis's hours in the office. (Id. at 93-94.) Mr. Bennis acknowledges that "one constant criticism of his performance throughout his employment" was that "he over-utilized the flexible nature of the GSM scheduling and did not always show up or leave at exact times." (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 11 [Doc. No. 34].) The Court finds that Defendant has met its burden of producing a legitimate, nondiscriminatory reason for terminating Mr. Bennis.

### c. Pretext

Because Defendant has proffered a legitimate, nondiscriminatory reason for terminating Mr. Bennis, Defendant is entitled to summary judgment unless Mr. Bennis submits evidence sufficient to establish both that Defendant's explanation is pretextual and that age-based animus was the real reason for Defendant's adverse action. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 519 (1993). The ultimate burden of persuading the factfinder of intentional age discrimination rests with the plaintiff at all times. Lewis, 467 F.3d at 1137.

Mr. Bennis argues that Defendant's stated reason for terminating him is pretextual on several grounds: (1) Mr. Bennis received generally positive reviews from 2005 to early 2009; (2) Mr. Bennis did not have a full year to complete his Employment

Development Plan objectives; (3) Defendant enlarged its list of reasons for terminating Mr. Bennis each time there was an inquiry about the termination basis; (4) the cumulative effect of Defendant's words and actions creates a reasonable inference of age discrimination; (5) Ms. Johnson's notes on Mr. Bennis, which Defendant produced in this case, were not part of his personnel record when he requested a copy in July 2010; and (6) Defendant failed to address any alleged performance issues with lesser discipline. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 9-18 [Doc. No. 34].)

### i. Mr. Bennis's Generally Positive Reviews

Mr. Bennis argues that Defendant's proffered reason of Mr. Bennis's lack of performance is pretext because he received generally positive reviews from 2005 to early 2009 from his supervisors, before and including Rachael Johnson. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 11-12 [Doc. No. 34].) For example, he highlights Mr. Stoffel's statement in a June 2007 review that Mr. Bennis had "done an exceptional job of delivering great customer service to the visitors of Xcel and Rivercentre and continue[s] to be a source of pride for the organization." (Stoffel Dep., Ex. 2 at R26(a)091.) Mr. Bennis also notes Ms. Johnson's review of his performance from April 2008 to January 2009 as meeting or exceeding expectations in every category. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 12 [Doc. No. 34].) Mr. Bennis further observes:

> Looking at Plaintiff's performance reviews, Johnson's criticism of Plaintiff's work was entirely based on his non-event work; Johnson consistently agreed that Plaintiff met and exceeded expectations running events and working with the part-time staff who worked the games.

(Id. at 13.)  In Mr. Bennis's opinion, he "was hired to run events at the Xcel Energy

Center," and "he did that well, even in the eyes of Johnson."  (Id.)

The Court disagrees that Mr. Bennis's generally positive performance reviews

show pretext.  Receipt of positive reviews in the past, in and of itself, does not

necessarily raise an inference of age discrimination.  Lewis, 467 F.3d at 1138.  Here, Mr.

Bennis relies on the positive reviews for his event-related work while ignoring the

criticisms of his non-event work at the office.  But even if the main focus of Mr. Bennis's

job was to supervise events, Mr. Bennis had non-event responsibilities as well.  (Stoffel

Dep. at 13-16.)  Indeed, early on in Mr. Bennis's employment, Mr. Stoffel voiced

concerns to Mr. Larson that Mr. Bennis might not be contributing to non-event work,

such as recordkeeping and making reports to improve the department during non-event

times.  (Larson Dep. at 27-28.)  By October 2009, Mr. Bennis was on notice that his

duties were not "mostly event driven (90%)," as Mr. Bennis maintained in his rebuttal to

Ms. Johnson's August 2009 review.  (See Decl. of Thomas J. Conley, Ex. 4 at

R26(a)065-066.)  Defendant was fair to criticize Mr. Bennis's non-event work, and Mr.

Bennis's failure to improve his office performance was a legitimate, nondiscriminatory

reason for his termination.

### ii.      Mr. Bennis's Employment Development Plan

Next, Mr. Bennis argues that Defendant's use of his incomplete Employee

Development Plan as grounds for termination shows pretext, because the deadline to

complete his EDP objectives had not expired by the time of Mr. Bennis's termination.

(Pl.'s Resp. to Def.'s Mot. for Summ. J. at 12-13 [Doc. No. 34].)  On November 20,

2009, Mr. Bennis presented his EDP to Ms. Johnson. (Decl. of Thomas J. Conley, Ex. 5.) Ms. Johnson acknowledges that ideally, Mr. Bennis had one year to complete the EDP objectives. (Johnson Dep. at 171.) By the time of his termination on July 1, 2010, Mr. Bennis was "in the process of working on" the first and second objectives. (Bennis Dep. at 144.) Ms. Johnson, however, did not find his efforts satisfactory because any reduction in staff hours was initiated by others, and Mr. Bennis made little effort to develop a process to reduce part-time hours. (Johnson Dep. at 165-67.) For the third objective, Ms. Johnson concluded that Mr. Bennis had not developed new ideas for improving traffic flow at the base of an escalator and preventing smoke from entering the building. (Id. at 168.) For the fourth objective, Ms. Johnson concluded that Mr. Bennis had not developed a new process for determining the correct number of part-time event staff. (Id. at 174.) The Court recognizes that the Xcel Center's "busy season" of September through June could hinder completing the EDP objectives during this period. (See Bennis Dep. at 124.) Nonetheless, Mr. Bennis had more than seven months to make satisfactory progress on his EDP objectives. Mr. Bennis failed to do so, and Ms. Johnson's consideration of his incomplete EDP was a legitimate, nondiscriminatory reason for his termination.

### iii. Defendant's Growing List of Reasons for Mr. Bennis's Termination

Mr. Bennis also argues that Defendant's growing list of reasons for his termination—more detailed each time there was an inquiry about the termination basis—shows pretext. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 15-16 [Doc. No. 34].) After

Mr. Bennis initially requested the reason for his termination, Delores Murphy,

Defendant's Senior Director in Human Resources, responded:

> The reason for termination was Mr. Bennis's lack of performance, which includes but is not limited to the following:
>
> Lack of performing core tasks of the position in a consistent and effective manner, insubordinate behavior toward management and attendance.

(Murphy Dep., Ex. 11 at R26(a)058.)  Later, in response to the EEOC charge filed by Mr.

Bennis, Steve Weinrich, Defendant's Vice President and General Counsel, provided a

longer explanation spanning three single-spaced pages.  (Aff. of Jay A. Tentinger at

R26(a)036-038.)  Mr. Weinrich's letter sets forth Mr. Bennis's discrimination allegations,

Defendant's respective responses, and grounds for Mr. Bennis's lack of performance.

(Id.)

    "Pretext may be shown with evidence that the employer's reason for the

termination has changed substantially over time."  Loeb v. Best Buy Co., Inc., 537 F.3d

867, 873 (8th Cir. 2008).  For example, pretext was evident when an employer first

claimed to have fired an employee "due to corporate reorganization," but later claimed

discharge on grounds of poor performance.  Scheidecker v. Arvig Enters., Inc., 122 F.

Supp. 2d 1031, 1041 (D. Minn. 2000).  Here, however, Mr. Weinrich's explanation for

terminating Mr. Bennis is entirely consistent with Ms. Murphy's letter to Mr. Bennis's

former counsel.  Both documents state that Defendant terminated Mr. Bennis for "lack of

performance," and Mr. Weinrich's letter elaborates on Ms. Murphy's earlier explanation.

Accordingly, the Court does not find pretext on the basis of Ms. Murphy's and Mr.

Weinrich's letters.

### iv. Defendant's Allegedly Age-Discriminatory Words and Actions

Mr. Bennis contends that Defendant's proffered reason for termination was a "hasty fabrication" done the day after Mr. Bennis allegedly accused Ms. Johnson of discriminating against him. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 9 [Doc. No. 34].) Mr. Bennis also argues that Defendant's discriminatory words and actions—specifically, by Ms. Johnson, Ms. Peters, and Mr. Armstrong—toward Mr. Bennis show pretext.

The Court disagrees that Defendant's explanation for Mr. Bennis's termination was a "hasty fabrication." The record shows that Ms. Johnson identified Mr. Bennis's performance issues in a written review at least as early as August 27, 2009. (Decl. of Thomas J. Conley, Ex. 3.) The review noted Mr. Bennis's strengths in event work and his areas of improvement for non-event work. (Id. at R26(a)073.) Mr. Bennis was aware of her criticism about his non-event work, as he wrote a four-page rebuttal in response to the August 2009 review. (Decl. of Thomas J. Conley, Ex. 4 at R26(a)066-070.) In October 2009, Mr. Bennis and Ms. Johnson had a monthly meeting, during which she reminded Mr. Bennis that his duties were not "mostly event driven (90%+)," as he believed. (Id. at R26(a)065.) And in 2010, she raised Mr. Bennis's performance issues with Delores Murphy several times, eventually involving Steve Weinrich and Jack Larson in the discussions. (Johnson Dep. at 77-78.) Accordingly, Defendant's termination of Mr. Bennis for lack of performance was neither hasty nor fabricated.

The Court also finds that Ms. Johnson's, Ms. Peters's, and Mr. Armstrong's conduct toward Mr. Bennis does not warrant an inference of discrimination. Regarding

Ms. Johnson's actions, Mr. Bennis alleges that she held Mr. Bennis to a higher standard of working hours, a higher standard of dress, and more stringent discipline than his younger co-workers. Mr. Bennis further alleges that his younger co-workers should have received less comp time, that they were allowed to work shorter hours in the summer after Mr. Bennis's termination, and that they received more paid-time off than Mr. Bennis.

The record does not support Mr. Bennis's allegations that Ms. Johnson discriminated against him based on his age. First, regarding the allegedly higher standard of working hours, the guest services managers' monthly schedules show that Mr. Bennis averaged forty-seven and a half hours per week; Ms. Peters averaged forty-two hours per week; and Mr. Armstrong averaged more than forty-seven and a half hours per week. (Bennis Dep. at 41-42.) The fact that Ms. Peters had more office responsibilities and fewer events than Mr. Bennis explains the discrepancy between their hours. (Id. at 46-47.) Mr. Bennis acknowledged that because events often lasted into the evening, his job required more hours. (Id.) Mr. Bennis also acknowledged that he was happy to work the extra hours. (Id. at 45.) Mr. Armstrong's average hours per week—higher than Mr. Bennis's—do not support the allegation that Ms. Johnson held Mr. Bennis to a higher standard of working hours than Mr. Armstrong, particularly because their jobs were "[v]ery similar." (Id. at 47.) Mr. Bennis's belief that Mr. Armstrong's reported hours were not accurate—based on Mr. Bennis's observations that Mr. Armstrong arrived late or left early—does not sufficiently substantiate his allegation. (See Bennis Dep. at 44.) Second, Mr. Bennis does not offer any facts in support of his belief that Ms. Johnson held

him to a higher standard of dress than Mr. Armstrong.  (<u>Id.</u> at 53-54.)  Mr. Bennis

acknowledges that any difference in dress code did not affect his compensation, vacation,

or PTO time.  (<u>Id.</u> at 52.)  And Ms. Johnson asked Mr. Bennis but not Mr. Armstrong to

wear a tie because Mr. Bennis's events were more high-profile.  (Johnson Dep. at 197-

98.)  Third, Mr. Bennis simply speculated that she disciplined younger co-workers,

namely Mr. Armstrong, less stringently than Mr. Bennis.  (Bennis Dep. at 82-83.)

Fourth, Mr. Bennis merely expressed his opinion that his younger co-workers should not

have received as much comp time as Mr. Bennis because, in his view, they did not work

as many hours.  (<u>Id.</u> at 58-59.)  Fifth, Mr. Bennis asserts that Mr. Armstrong and Ms.

Peters were allowed to work shorter hours in the summer after his termination, based on

an alleged stray comment by Mr. Armstrong after Mr. Bennis's termination.  (<u>Id.</u> at 61-

62.)  But even if true, it does not show that Ms. Johnson favored Mr. Armstrong and Ms.

Peters regarding summer hours while Mr. Bennis was still employed with Defendant.

Sixth, Mr. Bennis does not provide any evidence that Ms. Johnson granted Mr.

Armstrong or Ms. Peters more paid-time off than Mr. Bennis.  (<u>Id.</u> at 56-57.)

Defendant's records indicate that in 2009-2010, Mr. Bennis took twenty-eight PTO days

and Ms. Peters took twenty-five days.  (Decl. of Christie Schulte at ¶ 3.)  Ms. Peters also

had several days off for a medical leave in 2009, and an approved medical leave did not

count against PTO time.  (<u>Id.</u>)  Accordingly, the Court finds that Ms. Johnson did not

discriminate against Mr. Bennis on the basis of age.

Regarding Ms. Johnson's comments, Mr. Bennis viewed the following as age-

related:

- In November 2008, in response to Ms. Peters's comment about Mr. Bennis's allegedly racist comment after President Obama's election, Ms. Johnson told Mr. Bennis to be careful about his comments, because "times have changed." (Bennis Dep. at 33.)

- In Mr. Bennis's January 2009 performance review, Ms. Johnson wrote that "it is very easy to tell the things that are not important to you [Bennis]," and that an area for Mr. Bennis to improve is his "adaptability to new ideas." (Decl. of Thomas J. Conley, Ex. 2 at R26(a)082-083; Bennis Dep. at 94-96.)

- In Mr. Bennis's August 2009 performance review, Ms. Johnson wrote that Mr. Bennis came to meetings unprepared and without his glasses. (Bennis Dep. at 73.)

- In August 2009, in response to Mr. Bennis's statement that he did not need his reading glasses, Ms. Johnson told Mr. Bennis that "your eyes get worse as you get older." (Id. at 72-73.)

- On June 30, 2010, Ms. Johnson failed to question him after Mr. Bennis asked her whether she was treating him differently because of "where he was in life." (Id. at 187.)

The Court disagrees. The Court considers factors such as whether the statements were made by employees who took part in the decision or influenced the decision to terminate the plaintiff; the time gap between when the statements were made and the date of termination; and whether the statement itself exhibits discriminatory animus, or merely an opinion that such animus might exist. Wittenburg v. Am. Express Fin. Advisors, Inc., 464 F.3d 831, 837 (8th Cir. 2006). Ms. Johnson—in combination with Ms. Murphy, Mr. Larson, and Mr. Weinrich—decided to terminate Mr. Bennis's employment. (Johnson Dep. at 78-81.) But her comments to Mr. Bennis are too temporally removed from the date of his termination, and they do not exhibit discriminatory animus. Ms. Johnson's comment to Mr. Bennis to be careful about what he said because "times have changed"

came almost two years before Mr. Bennis's termination, and it simply implies that society is now more politically correct than in previous years. Similarly, Ms. Johnson's comment to Mr. Bennis that "your eyes get worse as you get older" came nearly one year before Mr. Bennis's termination, and it is a fact-of-life observation. Likewise, Ms. Johnson's comments in January 2009 that "it is very easy to tell the things that are not important to you [Bennis]" and that Mr. Bennis could improve his "adaptability to new ideas" came more than one year before his termination. These comments merely reflect on Mr. Bennis's work priorities and areas of improvement. Further, Ms. Johnson's comment in August 2009 that Mr. Bennis came to meetings unprepared and without his glasses came nearly one year before Mr. Bennis's termination; it merely assesses Mr. Bennis's level of preparation at meetings. Finally, the Court does not infer discriminatory intent from Ms. Johnson's silence after Mr. Bennis asked whether she was treating him differently because of "where he was in life." All of Ms. Johnson's assertions are reasonably susceptible to an entirely benign connotation.

Regarding Ms. Peters's conduct, Mr. Bennis found her comments below to be age-related:

- Ms. Peters commented that Mr. Bennis likes Classic Rock because it is "from your era." (Bennis Dep. at 77.)

- In the summer of 2009, on a work outing to an ice cream shop, Ms. Peters told Mr. Bennis that he was "old-fashioned" for ordering vanilla ice cream. (Id. at 79-80.)

- In October 2009, Ms. Peters told Mr. Bennis that did not need to worry about making arrangements because his children were all grown up. (Id. at 73-74.)

- In April 2010, Ms. Peters commented that Mr. Bennis did not need his job like Ms. Peters did because Mr. Bennis was retired. (Id. at 71.)

The Court disagrees. Notably, Ms. Peters took no part in the decision to terminate Mr. Bennis, and Mr. Bennis does not allege that Ms. Peters influenced the decision to terminate him. Moreover, of the comments for which Mr. Bennis identifies a date, they are temporally removed from his termination, ranging from three months to almost a year before July 1, 2010. See Ramlet, 507 F.3d at 1152 (finding that comments made at least four months before the plaintiff's termination were not related to the decisional process). Without more, the Court does not infer discriminatory animus from Ms. Peters's statements.

Regarding Mr. Armstrong's conduct, Mr. Bennis found his comment that Mr. Bennis had no social life because "your kids are all grownup" to be age-related. (Bennis Dep. at 75.) Again, the Court disagrees. Mr. Armstrong was not involved in Defendant's termination, and this sole comment is best characterized as a stray remark—not as evidence of discrimination.

Therefore, Defendant's allegedly age-discriminatory words and actions do not support a finding of pretext.

### v. Production of Johnson's Employment Notes

In support of his pretext argument, Mr. Bennis submits that Ms. Johnson's notes—produced during this litigation—were not part of his personnel record when he requested a copy in July 2010. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 10 [Doc. No. 34].) Under Minnesota law, "written comments or data kept by the employee's supervisor" are

not considered part of the personnel record, "provided the written comments or data are kept in the sole possession of the author of the record" MINN. STAT. § 181.960, subd. 4(7). The parties do not contest whether Ms. Johnson had sole possession of her notes. If she had sole possession of them, Defendant was not required to produce Ms. Johnson's notes on Mr. Bennis when he requested a copy of his personnel record. Thus, the absence of Ms. Johnson's notes in Mr. Bennis's copy of his personnel record does not show pretext.

### vi.    Lesser Discipline

Finally, Mr. Bennis argues that Defendant failed to address any alleged performance issues with lesser discipline. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 10 [Doc. No. 34].) Mr. Bennis does not cite any authority obligating Defendant to address performance issues with lesser discipline before termination. (Id.) The record indicates that Mr. Bennis was on notice—at least as of August 2009—of his performance issues. (Decl. of Thomas J. Conley, Ex. 3.) Mr. Bennis had approximately ten months to take Ms. Johnson's criticisms of his non-event work to heart, but instead he maintains that such tasks exceeded the scope of his employment. (See Pl.'s Resp. to Def.'s Mot. for Summ. J. at 13 [Doc. No. 34].) Where the record reflects that Mr. Bennis's job encompassed both event and non-event duties, and where Mr. Bennis was on notice of his performance issues for several months before his termination, the Court finds that Defendant's failure to subject Mr. Bennis to lesser discipline does not support a finding of pretext.

In summary, Mr. Bennis has not shown that a genuine question of fact exists regarding pretext and Defendant's motivations for terminating him.  Mr. Bennis demonstrated neither direct nor indirect evidence of Ms. Johnson's discrimination on the basis of age.  Under <u>McDonnell Douglas</u>, Mr. Bennis has not established a prima facie case.  Even if he had, Defendant produced a legitimate, nondiscriminatory explanation for Mr. Bennis's termination, and Mr. Bennis has not presented sufficient evidence to create an issue of fact that Defendant's articulated reason for the termination was pretextual.  <u>See</u> <u>McDonnell</u>, 411 U.S. at 802-04.  Thus, the Court grants Defendant's motion for summary judgment on the age discrimination claims.

### C. Hostile Work Environment

To establish a claim of a hostile work environment, Mr. Bennis must prove that: (1) he belongs to a protected group; (2) he was subject to unwelcome harassment based on his age; (3) the harassment affected a term, condition, or privilege of employment; (4) his employer knew or should have known of the harassment; and (5) the employer failed to take proper action.  <u>See</u> <u>Peterson v. Scott Cnty.</u>, 406 F.3d 515, 523-24 (8th Cir. 2005).  Harassment is actionable when it is "so severe or pervasive" as to "alter the conditions of [the victim's] employment and create an abusive working environment."  <u>See</u> <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 786 (1998) (analyzing hostile work environment in the context of sexual harassment claims under Title VII); <u>Brennan v. Metro. Opera Ass'n, Inc.</u>, 192 F.3d 310, 318 (2d Cir. 1999) ("The analysis of the hostile working environment theory of discrimination is the same under the ADEA as it is under Title VII.").  In determining whether the alleged harassment creates a hostile work environment, courts

consider the frequency of the offending conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with work performance.  Hesse v. Avis Rent A Car Sys., Inc., 394 F.3d 624, 630 (8th Cir. 2005). The Eighth Circuit has "repeatedly emphasized that anti-discrimination laws do not create a general civility code.  Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law."  Shaver v. Indep. Stave Co., 350 F.3d 716, 721 (8th Cir. 2003).

Defendant argues that Mr. Bennis's complaints of disparate treatment do not rise to the level of a hostile working environment, and thus should be dismissed.  (Def.'s Mem. in Supp. of Mot. for Summ. J. at 18 [Doc. No. 22].)  In opposition, Mr. Bennis argues that he has established a prima facie case of a hostile work environment; and that genuine issues of material fact exist as to whether Mr. Bennis's subjection to unwelcome harassment was based on his age, and whether the harassment affected a term, condition, or privilege of his employment.  (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 20-21 [Doc. No. 34].)  Mr. Bennis relies on his allegations of age discrimination by Ms. Johnson, Ms. Peters, and Mr. Armstrong, as described earlier, to support his hostile working environment claim.  (See id. at 21.)

Mr. Bennis belongs to a protected group under the ADEA because he was older than forty years old when the alleged conduct occurred, thus satisfying the first element of a hostile work environment claim.  Also, Mr. Bennis alleges that his supervisor, Rachael Johnson, created the hostile work environment, thus satisfying the fourth element.  At issue is whether Mr. Bennis was subject to unwelcome harassment based on

his age (element two), whether the harassment affected a term, condition, or privilege of employment (element three), and whether Defendant failed to take proper action (element five).

The Court finds that the alleged discrimination by Ms. Johnson, Ms. Peters, and Mr. Armstrong does not constitute a hostile working environment. Regarding Ms. Johnson's conduct, the record does not show that she held Mr. Bennis to a higher standard of working hours, a higher standard of dress, or more stringent discipline than his younger co-workers. (See supra Part III(B)(2).) The record also fails to show that the younger co-workers should not have received as much comp time as they did, that they were allowed to work shorter hours in the summer while Mr. Bennis was still employed with Defendant, and that they received more paid-time off than Mr. Bennis. (Id.) A lack of evidence that Ms. Johnson treated Mr. Bennis differently from his younger co-workers does not support a finding of a hostile working environment.

Ms. Johnson's allegedly age-related comments to Mr. Bennis are also insufficient to create a hostile work environment. Spread over almost one year, Ms. Johnson's approximately five comments were infrequent. They were also mild—a mere reminder that "times have changed," a fact-of-life statement that "your eyes get worse as you get older"; and performance review statements that it was "very easy" to tell what tasks did not matter to Mr. Bennis, that he could improve his "adaptability to new ideas," and that Mr. Bennis attended meetings unprepared and without his glasses. (Bennis Dep. at 33, 72-73, 94-96.) These comments were not physically threatening or humiliating, and they did not unreasonably interfere with his work performance. Rather, they mostly appear

geared toward improving Mr. Bennis's work performance and interactions with colleagues.  Therefore, Ms. Johnson's statements do not constitute a hostile work environment.

Similarly, the allegedly age-related comments by Ms. Peters and Mr. Armstrong do not create a hostile work environment.  Mr. Bennis contends that Ms. Peters made four age-related comments, sometime between the summer of 2009 and April 2010: that Mr. Bennis likes Classic Rock because is "from [his] era," that he was "old-fashioned" for ordering vanilla ice cream, that he did not need to worry about making arrangements because his children were grown, and that he did not need his job like Ms. Peters did because Mr. Bennis was retired.  (Bennis Dep. at 71, 73-74, 77, 79-80.)  Mr. Armstrong allegedly stated that Mr. Bennis had no social life because his children were all grown. (Id. at 75.)  None of these comments unreasonably interfered with Mr. Bennis's work performance.  Where Ms. Peters's four comments were spread across almost one year, and Mr. Armstrong's comment was a one-time occurrence, these comments were infrequent.  Not one was physically threatening or particularly humiliating.  These comments were mild, reflecting little if any age-discriminatory animus.  At best, they were teasing comments, and at worst, they were unkind or insensitive.  Such offhand comments and isolated incidents do not constitute a hostile work environment.

Mr. Bennis's own testimony does not support a hostile work environment claim:

Q:      In your own words, what constituted the hostile work environment that you experienced at MSE?

A:    It was the difference in treatment that I was receiving while working with MSE, as far as being treated differently than other employees, managers that I was working with in the guest services department.

But also the relationship that I had with Rachael Johnson, the type of environment that she fostered as having managers work against each other. It was a real difficult position to be in when I was there.

Q:    All right.  Is there anything else that you believe constituted—or constitutes a hostile work environment that you experienced at MSE?

A:    I just felt I was being treated different, and the standards were different for me than the rest of the employees.

(Bennis Dep. at 14.)  Mr. Bennis further testified that Ms. Johnson "took him out of the picture" as far as they used to have weekly meetings with higher management."  (Id. at 205.)  Although such an environment is less than ideal, Mr. Bennis's feeling of being treated differently, without more, does not rise to the level of a hostile working environment.  The Court finds that Mr. Bennis was not subject to unwelcome harassment based on his age, and thus a term, condition, or privilege of employment was not affected.

Finally, the record does not show that Defendant failed to take prompt and effective remedial action with respect to any harassment that it knew, or should have known, was occurring.  Mr. Bennis did not make any formal reports regarding conduct or statements by Ms. Johnson, Ms. Peters, and Mr. Armstrong that he found age-discriminatory.  (E.g., Bennis Dep. at 35.)  Thus, like the second and third elements of Mr. Bennis's hostile working environment claim, the fifth element is not met here.

For these reasons, the Court grants summary judgment on Mr. Bennis's hostile work environment claim.

**D. Sanctions**

Defendant moves for sanctions under Federal Rule of Civil Procedure 11(b)(2) against Mr. Bennis, arguing that his claims are not warranted by existing law or by a non-frivolous argument.[5]  (Def.'s Mot. for Rule 11 Sanctions [Doc. No. 25.])  Defendant submits that based on Mr. Bennis's deposition testimony, Mr. Bennis would not be able to survive summary judgment on his age discrimination and hostile working environment claims, and that additional discovery would not assist him in establishing these claims. (Id. at 2.)  In opposition, Mr. Bennis argues that sanctions are not warranted because he believes that he submitted substantial direct and indirect evidence of Defendant's animus toward him, as well as case law,[6] to support his claims.

_____

[5] On August 23, 2012, Defendant served this motion to give Mr. Bennis the opportunity to dismiss his claims within twenty-one days after service.  (Def.'s Mot. for Rule 11 Sanctions at 1 [Doc. No. 25.]); see FED. R. CIV. P. 11(c)(2).  Because Mr. Bennis did not dismiss his claims, Defendant filed this motion on November 28, 2012, seeking reasonable expenses and attorney's fees incurred in connection with the sanctions motion and the summary judgment motion.  (Def.'s Mot. for Rule 11 Sanctions at 1 [Doc. No. 25.])

[6] Mr. Bennis argues that denial of summary judgment is proper under Steward v. Sears Roebuck & Co., 312 F. Supp. 2d 719 (E.D. Penn. 2004) (denying summary judgment on the ADEA claim because the plaintiff presented evidence of positive performance evaluations and merit bonuses; less favorable treatment than younger technical managers; and inconsistencies in the proffered reasons for the termination) and Kragor v. Takeda Pharm. Am., Inc., 702 F.3d 1304 (11th Cir. 2012) (denying summary judgment on the ADEA claim where the employer's decision-maker, after terminating the plaintiff for misconduct, stated without qualification that the employee was an exceptional employee, had done nothing wrong, had done everything right, and should not have been fired).

These non-binding cases are distinguishable.  Unlike the plaintiff in Steward, Mr. Bennis did not receive any merit bonuses, was not treated less favorably than his younger co-workers, and the reasons for his termination were consistent.  See 312 F. Supp. 2d at 726.  And unlike the plaintiff in Kragor, Mr. Bennis does not present any evidence that

Under Rule 11(b)(2), an attorney certifies that by presenting a pleading to a court, the claims and legal contentions "are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." FED. R. CIV. P. 11(b)(2).  As addressed earlier, Mr. Bennis does not present direct evidence of age discrimination.  His indirect evidence of age discrimination also fails, because Mr. Bennis establishes neither a prima facie case nor that Defendant's proffered reason for Mr. Bennis's termination is pretextual.  Similarly, Mr. Bennis's hostile work environment claim falls short because the allegedly age-discriminatory words of his younger colleagues are no more than sporadic remarks, teasing at best and insensitive at worst.  And the record does not support Ms. Johnson's allegedly age-discriminatory actions, whether regarding working hours, dress standards, discipline, comp hours, summer work hours, or paid-time off.  Mr. Bennis needed to substantiate his claims with more than mere self-serving opinions that Defendant treated him differently based on his age.

Nonetheless, the Court recognizes the fine line that Mr. Bennis's counsel must navigate between his duty to the client and his duty to the Court.  Although Mr. Bennis's claims lack merit, sanctions are not warranted.

For these reasons, the Court denies Defendant's motion for sanctions.

---

his performance on the job—which included non-event responsibilities—was flawless and that he should not have been fired.  See 702 F.3d at 1310.  Therefore, these two cases are inapposite.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      Defendant's Motion for Summary Judgment [Doc. No. 20] is **GRANTED**,

2.      Plaintiff's Complaint [Doc. No. 1] is **DISMISSED WITH PREJUDICE**, and

3.      Defendant's Motion for Sanctions [Doc. No. 25] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:        June 28, 2013                              s/Susan Richard Nelson
                                                         SUSAN RICHARD NELSON
                                                         United States District Court Judge